## WEBER *v.* SAMUEL.

A., a resident of Philadelphia, assigned to B., of the same place, certain real and personal property within the state of New York, in trust to pay a creditor resident in London in the first instance, and then to pay creditors generally. This deed not being recorded under the act of 1818, in .the county of the assignor's residence, may be avoided by creditors.

This right to avoid the deed, as against creditors issuing executions since the insolvency of the assignors, is vested exclusively in the insolvent trust of A., who may proceed by action without a previous demand upon the voluntary assignees.

The right of the insolvent trustee to recover from the voluntary assignee funds passing under the voluntary assignment, is restricted to such as have not been distributed prior to the commencement of his action, and notice or knowledge in the voluntary assignee of the intention of such action. And it is for the insolvent trustees to prove notice or knowledge in the voluntary assignees of the intent of the action.

An assignment of all the goods and chattels of the firm of R. & I. P., and of certain specified real estate, in trust to pay certain creditors—then to pay all other creditors of the firm who should release the firm—is voidable by creditors, for want of words passing all the estate of those whom it was stipulated should be released.

Where the assignees, under such deed, had filed their account in the Common Pleas under the act of Assembly, and the account had been advertised, and was then referred to auditors for distribution prior to the commencement of the action by the insolvent trustees disaffirming such voluntary assignment; and after action brought, but before *narr.* filed, the report of the auditors distributing the fund among those claiming under the voluntary assignment had been filed and confirmed, and distribution had been accordingly made under certificates issued by the prothonotary to each creditor, such decree and payment, in the absence of fraud, protects the voluntary assignees from a claim by the insolvent trustee for so much of the funds received.

Though the auditors could not decide on the rights of those not claiming under the deed, unless at the request of the assignee, yet the Common Pleas having jurisdiction over the subject-matter, had the power to interfere on the application of such claimants, and stay distribution under its decree until the adverse rights were determined.

The receipt of dividends by creditors who are also insolvent trustees, does not amount to an affirmance by them, in the capacity of trustees, of the deed under which such dividends were received.

Insolvent trustees recovering funds from a trustee under an assignment fraudulent in law, elect to treat the assignment as entirely void; hence the creditors releasing under the deed, by bringing in the amounts received by them, may come in *pari passu* with the non-releasing creditors.—Per Rogers, J.

*April* 13—20. Assumpsit for money had and received with the other common counts. The plaintiffs were the insolvent assignees of I. Phillips and J. L. Moss, and the question was the right to recover money received under the assignment of Phillips and Moss.

On the trial before Rogers, J., at Nisi Prius, it appeared that I. Phillips and J. L. Moss, " composing the firm of R. & I. Phillips, of Philadelphia," by indenture dated March 22, 1837, reciting their inability to pay their debts, conveyed to J. M. Moss and D. Samuel, of Philadelphia, their joint and separate property, real and personal, within the state of New York, more particularly three houses in Walker street, New York; two bonds and mortgages on houses there; merchandise on board the ship Groton, lying in the port of New York; merchandise and effects in the hands of L. & C., or any other person in said city; all merchandise which might thereafter arrive in said city, belonging to the assignors, or either of them; all debts owing to them, or either of them, by persons

residing in New York—in trust to sell and pay debts due, or to become due, to Jonas Phillips and Sons of London, by the assignors, jointly or separately : the surplus to be divided equally among the other creditors of the assignors.   This instrument was recorded or registered in the city of New York, on the 23d of March, and afterwards in Delaware county, New York, where the assignors, or one of them, owned land.   The assignors and assignees resided in Philadelphia, but the deed was not recorded there.   Under this assignment, exclusively of other real and personal estate, the assignees received the proceeds of certain rags.   These had arrived from Leghorn at New York, where they were, previous to the assignment.   A bargain was subsequently consummated with Grant and Stone, of Philadelphia, who acted for a Boston house.   The sale was on time, and the goods delivered a few days after the assignment by both assignors and assignees, either in New York or Boston ; but it was not shown that any of the property passing under this assignment had been in Pennsylvania.   The only objection to this assignment, relied on, was the want of a registry here.

The net proceeds of the property passing under this assignment were less than the debt due Jonas Phillips and Son, and the assignees had paid to them a large portion of these funds prior to the bringing of this action.

After this action was brought, viz. May 25, 1839, the balance of the funds received under the March assignment had been paid by the defendants to J. Phillips and Son.

On the receipt of this money, J. Phillips and Son released the assignors and the assignees from all demands.   On the question of the right of the plaintiff to recover the money thus paid away after suit brought, besides the validity of the assignment, the questions were, 1. Whether this action was brought for that purpose ?  2. Whether the defendants had any notice of such intention ?

On the 22d June, 1837, by indenture between the same parties, the wives of the assignors joining, there was conveyed all the goods and chattels, debts, &c., due or belonging to R. & I. Phillips, and all securities taken therefor ; and the said parties conveyed certain specified real estate,—the legal title of parts of which was stated to be in I. Phillips,—in trust to pay personal debts of the assignors, not exceeding $800 for each assignor, next to pay or secure certain debts or liabilities of R. and I. Phillips ; then to pay ratably all other creditors of said R. and I. P., who, if resident in the United States, should, before Aug. 21, 1837, or, if resident in Europe, should, before Oct. 20, execute a full release of their demands

against R. and I. Phillips. Within the stipulated periods, creditors of R. and I. Phillips, to a large amount, executed a deed reciting the assignment and their design to take their dividends thereunder in satisfaction of their claims; in consideration whereof they released the said I. Phillips and J. L. Moss, copartners, as aforesaid, from all demands against R. and I. Phillips and the said assignors by name.

The validity of the preferred claims was proved, and the amount of debts due to the releasing creditors exceeded $112,000. In June and July, 1837, the inventory and appraisement had been filed and bonds given by the assignees. On the 2d Oct., 1837, I. Phillips and J. L. Moss filed their several petitions in insolvency, to which were annexed copies of the voluntary assignments of March and June. On the 19th of the same month, they were discharged, and Weber and McKean appointed by the court their trustees; but this appointment was not perfected by giving bonds until Sept. 29, 1838. These trustees were releasing creditors under the June assignment. In the mean time, on the 8th of Feb., 1838, the first account of the assignees, under the June assignment, was filed, and publication thereof made under the order or rule of practice of the court. On the 21st March, 1838, this account was referred to auditors to settle and make distribution.

Pending this reference, Weber and McKean on the same day they gave bond (Sept. 29, 1838) issued the writ in this case. But, as will be seen, no further proceedings were taken until 1844. On the 1st of Oct., the defendants addressed a circular to the releasing creditors, informing them of this action brought " for the avowed object of procuring a decision of the court by which the assignment of June 22d shall be declared void," thereby depriving such creditors of all claim on the fund; they were, therefore, notified to employ counsel to defend their particular interests. In Nov. 1838, the defendants filed a bill on the equity side of this court, setting forth the June assignment and the releases thereunder, the insolvent proceedings, their collection of assets, with the intention of distributing them under said deed, and that, in pursuance of that intention, they had filed an account in the Common Pleas, showing a balance for distribution and the publication thereof: that the releasing creditors claimed the exclusive right to these funds; that the insolvent trustees had brought this action to recover the same; that Lizardi had filed a bill in July Term, claiming an exclusive right; that Bosquet and several others had issued attachment-executions against the said fund; and that, being thus harassed, they were advised that they could not safely distribute the

said amounts without the direction of the court. They, therefore, prayed that said parties should answer the premises, and the complainants might receive the direction of the court for the distribution of the fund according to law and the true meaning of the June assignment, and for general relief. In this proceeding, nothing further was done.

Pursuant to public notice for a meeting, on the 6th May, 1839, of the auditors appointed by the Common Pleas, they were attended by claimants, among whom were Weber and McKean, the insolvent trustees. The auditors examined the account already mentioned, and a subsequent account of receipts and disbursements. The total balance of the two accounts was about $53,000, which was distributed among the creditors entitled under the June assignment; the amount due to the releasing creditors, among whom were Weber and McKean, exceeding $112,000. This report was filed in July, and confirmed absolutely, September 21, 1839. Between the 21st and 25th of September, the prothonotary of the Common Pleas issued certificates, under the seal of the court, stating the amount found due to each creditor by the confirmed report, and they were paid. Among others who receipted for these dividends, were Weber and McKean.

The defendants also gave in evidence the record of various proceedings by creditors in the Common Pleas, for the purpose of procuring the removal of Weber and McKean from the office of insolvent trustees, but there was nothing connecting defendants with such proceedings.

The first was a petition filed October, 1838, by the agent of Lizardi & Co., setting forth the June assignment, the release by Weber and McKean, and the proceedings in insolvency, and averring that the trustees had an interest in establishing the deed against petitioner, and other creditors about commencing proceedings to set it aside as fraudulent and void, and praying the court to discharge them from the office. On the 10th of November, 1838, this was dismissed. Four years afterwards, in 1842, another creditor filed a petition to the same effect, averring both assignments to be void, and also averring the receipt of the dividends by Weber and McKean, as releasing creditors. The trustees, in their answer, averred that proceedings had been instituted to set aside the assignment, but the judgment of the Supreme Court had been adverse to the attempt. (This is understood to refer to Fassitt v. Phillips, 4 Whart. 399.) They further averred that the assignments were in full force, and the respondents could not control

them, and that it would be their duty to collect the property when they should be declared invalid; that entertaining no doubt of their validity, they had not proceeded to collect any debts, none such existing as they believed accessible to them.   In the replication filed in July, 1843, the invalidity of the March assignment for want of a registry here was set up, and the effect of the decision in Fassitt v. Phillips argued.  In the rejoinder filed in October, 1843, the trustees averred they had brought suit to assert their rights, on account of any infirmity in the assignments, if any such existed, and that they had no interest in the March assignment, which could induce them to neglect their duty, nor had they any funds to carry on the suit, which was unnecessary, as suits by two creditors on their own account had been commenced; but that the petitioner might, if he chose, have carried on this suit, it being for the benefit of all the creditors. On the 10th of February, 1844, this petition was dismissed.   On the 17th, a petition by another creditor was filed for the same purpose, and alleging that no steps had been taken to avoid either of the assignments, and that in their suit, (the present one,) pretended to have been brought to test the validity of the June assignment, no steps had been taken to indicate their intention, and that in a proceeding for distribution, they had, so far as they could, ratified the same.   After answer and replication, the matter was referred to an auditor, to report whether by neglect, &c., the trustees had rendered themselves liable, or had any funds.   On his report, filed in 1847, the petition was dismissed; whereupon Weber and McKean were, on their own petition, dismissed from the office of insolvent trustees, and Miller, the present plaintiff, substituted as trustee.

Pending that proceeding, on the 11th May, 1844, the narr. was filed in this case, and a rule of reference entered, and arbitrators chosen, which rule was discharged by agreement, in June, 1847.

The then counsel for defendants, on his examination, stated, that at the institution of this suit, he had drafted the circular letter above mentioned; and that he had no recollection of any cause of action intended by this suit, but the one there referred to; he could not recollect how he obtained his information, but it seemed to be a general understanding, though he did not say of whom.

The plaintiffs gave in evidence a bill filed by Lizardi, a judgment and execution-creditor of the assignors, in 1838, for the purpose of setting aside the June assignment as fraudulent and void, but it appeared that his judgment at law was opened, and his suit discontinued, in 1839: also the proceedings in Fassitt v. Phillips, reported in 4 Whart. 399.   He also gave in evidence twelve

attachment-executions against defendants and others, by judgment-creditors of the assignors, issued in 1837, 1838, 1839; but in eleven of these no steps had been taken by the plaintiffs there until 1844. One was served in 1838, in which, in 1840, there had been rules to answer taken, and subsequent proceedings had.

A letter was also read from one of the creditors, on his own behalf, written to defendants in April, 1839, giving them notice that the two assignments were void, and that a distribution, though under order of court, would be at their peril.

The evidence of the plaintiff intended to show actual fraud in the assignments, and the explanatory and counter-testimony of the defendants is not here stated, as the question was excluded from consideration in the view of the case taken by the court.

ROGERS, J., instructed the jury—" That the plaintiff, as substituted trustee, had the right, and was the only person who could sustain the action. It was brought to recover the moneys received under the two assignments.

" The ground on which the plaintiff, who is the representative of all the creditors of Moss and Phillips, claims the money, is, that the deed of March, 1837, is void because it was not recorded in this county. That the second deed is void because it is an assignment by members of a firm purporting to convey merely the partnership goods and effects, with certain specific real estate, in trust for certain preferred creditors, and then in trust for such as should execute a release, while it contains no words of conveyance of the private or individual estate, real or personal, of either member of the firm, nor does it even purport to convey all the real estate of the firm.

" If the plaintiff is right in these propositions, there is nothing in the way of his recovery. The assignments being void as to creditors, the money in the hands of the assignees belongs to the plaintiff as the representative of the creditors, and as such he has a right to recover in this form of action, which in this state, where we have no Court of Chancery, is an equitable proceeding in the nature of a bill in chancery. As this is a bill in chancery, no demand is necessary before suit is brought. This, and not an action of trover, is the appropriate, and perhaps the only remedy.

" Was then the deed of the 22d March, 1837, void ? is the first inquiry. This is a question of law, and I instruct you that it is void, because it was not recorded in pursuance of the act of the 24th March, 1818, which declares that all assignments in trust for the benefit of creditors to be made and executed, which shall not be recorded in the office of the Recorder of Deeds, in the county

in which such assignor resides, within thirty days after the execution thereof, shall be considered null and void as against any of the creditors of the said assignor. It is admitted that the assignors and assignees resided, at the time of the assignment, and still reside in the city of Philadelphia; and further, that the assignment has not been recorded in this county. That this case falls within the letter of the act cannot be doubted, for it applies to voluntary assignments such as this, and makes it the duty of the assignees to have it recorded in the county where the assignor resides. But although this must be admitted, yet it is said it is not within its spirit, because the property assigned was actually situated in the state of New York, and that Phillips and Son, the preferred creditors, did not reside here, but in London. Now, admitting the facts to be as stated, as to all the assigned property, yet the actual *situs* of personal property makes no difference in the obligation to record the deed at the place of residence of the assignor. The law imperatively requires it should be recorded here as notice to all creditors claiming *dehors* the assignment, some of whom at least reside here. We must not endeavour to fritter away the plain words of an act by fanciful and nice distinctions, or supposed inconveniences, which may result from the law. The law is plain, easily complied with, and if its instructions are disregarded, the parties must abide the consequences. Of the inconveniences of the law, the legislature is the judge, not us.

"Besides, in contemplation of law, the *situs* of personal property is determined by the domicil or place of residence of the assignor. There are exceptions to this rule, which it is not necessary particularly to point out. It is sufficient this case does not fall within the class of exceptions. The law is, that the first assignment is void, and consequently that the plaintiff has the right to recover all the money in the hands of the defendants, at least at the time the suit was commenced, with interest from that date. Of the effect of the disbursements prior to the commencement of this action, I will speak hereafter.

"The plaintiff contends that the deed of the 22d of June, 1837, is fraudulent and void, because it is an assignment by the members of a firm, purporting to convey merely the partnership goods and effects, with certain specific real estate in trust for certain preferred creditors, and then in trust for such as should execute a release; while it contains no words of conveyance of the private or individual estate, either real or personal, of either member of the firm, nor does it even purport to convey all the real estate of the firm. If this be the character

of the deed, and that it is, judging from the instrument itself, dismissing, as we are bound to do, all considerations arising from extrinsic facts, *dehors* the deed, then, on the principle settled in Thomas *v.* Jenks, 5 Rawle, 221; Hennessy *v.* Western Bank, 6 Watts & Serg. 300; the case of Knox, Boggs & Co., and a host of kindred cases, as respects creditors, the deed is void. It is needless to repeat the reasons which governed the court. They were such as satisfied our minds at the time, and I remain yet to be convinced that we were in error. The time is not far distant, when the rule, firmly settled in the cases cited, will command the universal commendation of every professional man, of every disinterested and unprejudiced citizen, without exception. Indeed, I do not understand the principle there ruled to be disputed, but it is contended this case differs from those in an essential particular. It is said this is an assignment of *all* the partnership effects for the benefit of partnership creditors, and that it only stipulates for a release of the joint, and not the separate estate of the parties. But the answer to this suggestion, an answer I believe to be sound, is, that the deed does not purport to convey all the partnership property, but a part of the real property only, particularly mentioned, belonging to the partnership; and, secondly, that the release of the debts against the firm is necessarily a release of the separate property. I am at a loss to understand how, after a release of a partnership debt which necessarily extinguishes the debt, the creditor could proceed against separate property of the assignors, Moss and Phillips. No insolvent debtor has a right to coerce his creditor to execute a release, except he convey all his property, joint and separate. This is the just and honest principle settled in the cases cited, and I cannot perceive that this case forms an exception. On my conscience, I believe no honest, conscientious man would wish the law otherwise than it has been settled by repeated adjudications. When an unfortunate debtor surrenders all his estate, let him be discharged. Until he assigns all his property, creditors may, but in the name of common honesty, let them not be compelled to release him. Therefore, the deed of the 22d June is also void.

"But it is said the assignment is voidable, and that it was ratified by Weber and McKean, the first trustees. Without entering into the question whether the assignment is void or voidable as to creditors, but assuming it to be voidable merely, two points, which are questions of law, arise.

"1. Have the trustees, without the consent, or contrary to the

consent of the creditors, for so runs the testimony, the right to ratify it? And, secondly, is there any evidence that they have ratified it?

" On the first point, (in the peculiar circumstances which attend this case,) I consider they had no right to ratify the assignment.

" Weber and McKean were appointed trustees, without, as they say, and perhaps truly, their knowledge or consent. They however afterwards accepted the trust, and gave bonds for its faithful execution. Why they did accept, connecting it, as we must do, with their subsequent conduct and interest they have in supporting the assignment, it is not difficult to imagine. Their motive is apparent. They were preferred creditors to a large amount, and consequently occupied an antagonistic position to their duties as trustees. The sureties had a direct and immediate interest in supporting the assignment. Notwithstanding they knew the assignment was attacked at all points, (and the defendants knew it also,) the assignees paid, and they received large sums of money in payment of their respective preferred debts; nay, more, the bail in the bond stands in precisely the same predicament. It appears in evidence that an application was made to dismiss these faithless trustees. It was strenuously, and unfortunately successfully, resisted; and why resisted, is not a matter of surmise. The reason why the Court of Common Pleas refused to dismiss them we are not informed, as unfortunately the opinion of the court is not before us, and we know not the ground on which they based their decree. Had the facts which afterwards appeared been known at the time, I am inclined to think no court ever would have appointed them, and I must be permitted to express my regret that the court refused the application of the creditors. Weber and McKean ought not to have desired to retain the situation as trustees, in the peculiar position in which they were placed, particularly after the other creditors desired them to resign the trust. To hold, therefore, that the acts of these trustees, under such a state of facts, is a ratification of a voidable deed, would in my judgment be a disgrace to the law. It would be allowing any palpable, wilful breach of trust by interested trustees to destroy the rights of creditors, not only without, but contrary to their consent, in a matter well known and understood both by trustees and assignees.

" But granting that they have the right to ratify the assignment, is there any evidence they have done so? This is the next inquiry. In my judgment, and I so decide as a matter of law, there is no evidence that, as *trustees*, they ever ratified the assignment. In-

deed, *qua trustees* they have literally done nothing except to institute the suit we are now trying. They never received a cent of money *as trustees*, nor did they ever ask for any. This they carefully avoided. They never took a single step in the suit, not even so far as to file a declaration, showing their cause of action. They successfully repelled every attempt to dismiss them, but they would do nothing. They received, it is true, large sums of money, but in what character and for whose use? Not as trustees, but in payment of their respective debts as preferred creditors, in opposition to and contrary to their duties in a representative character. They seem to have forgotten that they were trustees. I grant, that as a general rule, a substituted trustee is bound by the act of his predecessor, but this principle has no application to the peculiar facts of this case. There is no joint act of theirs, with the single exception of commencing this suit. I agree, therefore, with the Court of Common Pleas, that Weber and McKean did nothing to validate the assignment, nor did they take any steps to invalidate it, except the institution of this suit. They were, therefore, I agree, not obnoxious to censure on that account.

"On this point of the case I wish to be distinctly understood. Although I am of the opinion that Weber and McKean have done nothing to ratify the assignment, yet I do not desire to be understood as any way approving the course they have thought proper to pursue.

"Whether they have been guilty of a breach of trust, of mismanagement and negligence, is a question before another tribunal; whether they have not incurred a heavy responsibility by their conduct will be a matter of grave inquiry, on the appeal which has been taken from the decision of the Court of Common Pleas, and in an action which we are informed has been brought against them at common law.

"All I mean now to say is, that there is no proof of any ratification of the assignment, and that this part of the defence wholly fails.

"But it is said that the plaintiff is not entitled to recover the money received under the second assignment, because the money so received was paid by the trustees to the preferred creditors, on notice and in pursuance of a decree of the Court of Common Pleas. But to this decree, which was made after the commencement of the suit, the trustees were not parties, nor were they entitled to be heard in opposition to the decree. This the Supreme Court ruled in Okie's Appeal, 9 Watts & Serg. 156. An auditor appointed to

adjust and settle the accounts of a voluntary assignee, is confined to the account between the assignee and the *cestuis que trust.* Third persons, as is there ruled, cannot interfere in the settlement, but must resort to adversary proceedings. It would, therefore, be against every principle of law and equity, that the plaintiff, who was no party to the proceedings, who had no right to interfere, who could not be heard, should nevertheless be bound by the decree or any distribution which the assignees thought proper to make in pursuance of it.

"But it may be said that this is hard measure of justice for the assignees. But not so. The assignees distributed the money on notice, ten days after the decree. The mode of protecting themselves against this peril is distinctly pointed out in Okie's Appeal, already cited. The accountant may, if he chooses, as is there held, · pay over the money to adversary claimants, in which case he would be entitled to indemnity, or he may claim to hold the money as a stakeholder; and if he does, the auditor or the court may determine his right before he is compelled to pay it over to the litigant parties. The assignees, if they had so chosen, might have paid the money over to the trustees, and taken an indemnity, or they might have protected themselves by alleging that they were stakeholders only, and, as such, were not bound to pay over the money until the right was determined. But this, it appears, was not done, for reasons best known to themselves. They chose to pay over to the preferred creditors; whether with or without indemnity, we know not, nor is it material. Nor is it of any sort of consequence whether they acted with or without the advice of counsel. It was paid at their own risk; and if improperly paid, innocent creditors are not to be injured by their mistakes or misapprehension of the law. I differ entirely from the counsel of the defendants, who contends that it was the duty of the trustees and creditors to take measures, by bill and injunction, to prevent them from distributing the money. Not so; it was the duty of the defendants to protect themselves.

"It is said they acted under advice of counsel, mistaking the decision of the court dissolving the injunction in the case of Fassit *v.* Phillips. On this point I must say I am very incredulous; but be it so; it is their misfortune, with which the creditors have nothing to do. They are not to blame, however mistaken they or their counsel may have been in relation to the case. All I have to say is, if they were deceived, it was because they were willing and anxious to be deceived. It is impossible for us to shut our eyes to

the glaring fact that there has been an anxious endeavour on all sides to avoid, by all and every means, the consequence of the court declaring the assignment void. This is the key to the conduct of the defendants. It can be explained on no other hypothesis. You will not fail to remark that the money was paid, notwithstanding the pendency of several attachments, bills in equity, and their own bill of interpleader, the very object of which was to determine to whom the money rightfully belonged; and notwithstanding they had express notice not to pay it over to the preferred creditor or creditors.

"It is said the money was distributed under the eyes, and with the assent of Weber and McKean. That they participated in the spoils, is most true. They received their own debts contrary to their duties as trustees. As trustees, they did nothing; and if they had, I should instruct you, under the peculiar circumstances of this case, it would not avail the defendants, who were aware, or ought to have been, that they were acting in bad faith.

"You will observe I do not put the case on the ground of fraud. The defendants had the right to pay the money to the preferred creditors. But, at the same time, they must be content to be responsible for a misapplication of it in paying it to persons not entitled to receive it.

"But it is further contended that the assignments can only-be attacked by adversary process, and this is true. It is ruled in Okie's Appeal, already cited, that third persons claiming adversely to a voluntary assignment, cannot interfere with the settlement among those claiming under it, but they must resort to adversary proceedings. But the suit we are now trying is an adversary proceeding within the meaning of the decision in Okie's Appeal. This suit, you will recollect, was brought on the 29th September, 1838, by the trustees of Phillips and Moss, insolvent debtors. It is an adversary proceeding, the only object of which was to recover money in the hands of the assignees, on the allegation that the assignments were illegal, with the view of distributing it among the general creditors, and preventing its application, or rather misapplication, to certain preferred creditors under the assignments. The trustees, you will observe, are the representatives of the creditors. In them, by the assignment, vests all the property of the insolvent. They can proceed in no other way than by suit. The doctrine that creditors who wish to test the validity of an assignment must do so by judgment, attachment or execution, only applies when there is no assignment to trustees for the benefit of

all. When there is an assignment, the rights of general creditors are merged in his. He is the only person that can proceed for the benefit of all; and this can only be done through the medium of such a suit as the one we are now trying.

"But it is said that no steps were taken by the trustees in this suit, and that it was abandoned. The suit was brought on the 29th September, 1838, and the money was paid in 1839, in the early part of that year. The suit could hardly have been abandoned in that short space of time. I see great negligence, and perhaps something worse on the part of the trustees, but nothing which would justify you in coming to the conclusion that the suit was abandoned. No declaration, it is true, was filed; but had the defendants been so disposed, they might have required the plaintiff to file his declaration, and to give a bill of particulars—an accurate statement of the extent and nature of his demand. Instead of pursuing this course, the then counsel for the defendants chooses to issue a circular letter, in which he notices only the assignment of the 22d June, 1837. If ignorant as to the object of the suit, which is difficult to believe after the repeated attachments of the property, the bills in chancery, the bill of interpleader, which have been given in evidence, they could have informed themselves in the mode already pointed out, or by an application to the trustees, who would doubtless have informed them of the object and nature of the suit, and that the design was to recover all the property, of whatever description, in their hands, and to distribute it among the general creditors of Moss and Phillips. The assignees, it is not denied, were aware that the creditors were attacking the validity of the assignments; there was, therefore, sufficient to put them on inquiry as to the nature of the suit brought by the trustees, a suit sufficiently comprehensive to embrace both the assignments. They ought to have known that they could not safely pay over the money to the preferred creditors until the validity of the assignments was properly tested. They might have protected themselves if they had desired to do so, but if they preferred to act on erroneous advice, as their own, on them be the loss, let it not fall on the heads of innocent creditors who have been pursuing their rights with untiring diligence.

"These observations are particularly applicable to the assignment of June, 1837, but it is said there is a difference between that assignment and the assignment of March, 1837. It is contended that the money which was paid to Phillips and Son, on the 25th

May, 1839, was paid in entire ignorance of the defect in the deed of March, 1837. That they were not aware that it was the intention of the creditors to attack the validity of that deed, although they knew it was intended to assail the deed of the 22d June. If that be the fact, of which you will judge, it is a defence on the first assignment. But it will be for you to inquire whether they knew it, or had sufficient to put them on inquiry. The suit of the 29th September, 1838, as has been before observed, was sufficiently broad to cover both assignments. Had they called on the trustees in the proper way, for a·bill of particulars, would they have been informed that the suit was intended to recover all the money, of whatever kind or description, that was in their hands belonging to the estate of Moss and Phillips, as well under the first as under the second assignment. For if they would, then there is nothing in this part of the defence.

" On this part of the case, you will pay attention to the fact, that the suit was brought, the attachments by the creditors issued, the bill in chancery filed, and the bill of interpleader, and from this and the other testimony in the cause, you will judge whether this payment was made in good faith, ignorant of the fact that the validity of that assignment was called in question, or from a desire, proceeding from what motive it might, good, bad, or indifferent, to favour Phillips and Son at the expense of other creditors. If the latter be the case, the defendants must look for indemnity to Phillips and Son. They cannot prefer them at the expense of others. I repeat to you that this is not a question of fraud; they had the right to pay the creditors under the assignment, but if Phillips and Son had no right to receive the money, it must be again paid to those who have. You will observe that the non-recording the deed in this state was the fault of the assignors and assignees. And if by not recording the deed the creditors remained ignorant of it, it shows the policy of the law in requiring it to be recorded in the state, and thereby giving notice to the creditors here of the situation of Moss and Phillips, who were their debtors. As there are none so blind as those who will not see, so none are so ignorant as those who will not inquire. If, therefore, you should believe that the defendants would neither see nor inquire, it will be for you seriously to consider whether it would be just that the loss, if any, should fall on those who are innocent, and have prosecuted their rights with due and proper diligence. If Phillips and Son have received money to which they had no right— and that they have cannot be denied—it will be for you to decide

whether they ought to be responsible to the trustees, or to the defendants from whom it was received; or, in other words, whether the defendants ought not to look to Phillips and Son for indemnity, rather than the present trustee, Mr. Miller. It is also said that Miller, the present trustee, has elected to proceed against Weber and McKean, the original trustees, and that this is a bar to the present suit. That is no bar; he may proceed against either or both. What effect a judgment and satisfaction in this suit may have, it is premature to decide. That question will properly arise in the trial of the suit against Weber and McKean. It cannot be tried here. If this case comes within the doctrine of election, which it does not, it may be a bar to the proceedings against Weber and McKean, but cannot by any possibility be a bar to this action, brought before those suits were commenced. If an election at all, it is an election to proceed against the present defendants.

"It remains for me to notice another point, that is to say, the extent of the credit to which the defendants are entitled under the March assignment. The defendants are entitled to credit for disbursements up to the time of the commencement of the suit.

"As to the June assignment, the defence has entirely failed. Nor have the preferred creditors the least right to complain. It is not sought to recover the money paid before the commencement, but that which was unlawfully paid after suit. If they desire it, they may participate in the distribution of the money, upon bringing the money they have received into the common fund."

The errors assigned were argued under four heads, by *Cadwalader* and *F. W. Hubbell*, for plaintiffs in error.

1. Were the assignments voidable? The argument in Thomas *v.* Moss, at this term, contains all that need be said as to the June assignment. As to the March assignment, the question is simply whether the deed is voidable under the act of 1818, though all the property assigned was out of the state, and the beneficiaries were foreigners. All fraud in this, as in the whole case, is negatived by the charge, and so was any dispute as to the locality of the property. Now it is the settled law, that the rights of creditors, and they alone are protected by the statute, always depend on the actual *situs* differing in this respect from the law of succession. Nor are statutes construed to apply extra-territorially, without express words; and the purpose of this act, which it is settled only protects an execution-creditor, cannot extend to property which never has been subject to execution. This act extends to partial

assignments; how then can it be applied: a merchant on a voyage cannot assign, however essential to protect his credit, or to raise money; nor can he send out an assignment to protect goods abroad, for the delay necessary to the mere copying in the registry will lose a mail, which carries the news of his suspension. For what purpose? No foreign or sister state would regard such a statute, nor would a registry here, stand instead of that required by them. But the question is not open on authority, and they state the rule, thus: the transfer of personalty is always valid, if according to the forms required by the *lex rei sitæ*; but the owner *may* transfer it according to the law of his domicil, unless there be a positive law of the *situs* thereby transgressed; Story Confl. Laws, s. 384; 2 Adams, 16; Dalrymple *v.* Dalrymple, cited 3 Hagg. 640, 641. This has been expressly recognised and acted on in Lowry *v.* Hall, 2 Watts & Serg. 129, and the true ground stated—the law does not regulate what it cannot protect. Why, even in cases of decedents, do we retain enough to satisfy creditors residing here, contrary to the rule that the law of the domicil governs there, but because that is but a rule of comity and convenience, allowed by the *lex rei sitæ?* Mothland *v.* Wireman, 3 Penna. Rep. 186; Miller's Estate, 3 Rawle, 318, and Milne *v.* Morton, 6 Binn. 361, preceded by Harrison *v.* Sterry, 5 Cranch, 298, which has been followed everywhere. [GIBSON, C. J.—That was the act of the law, not of the party.] But if the law of the domicil made it equally effective, it is a perfect illustration that that rule is not universal, and does not apply to conveyances of personalty; Blake *v.* Williams, 6 Pick. 306; Abraham *v.* Plestoro, 3 Wend. 538; all the judges agreeing on this point. The only case cited against this is 3 How. 514, which was an instance merely of giving effect to a conveyance, not of destroying one. To the same point are the cases on the collateral inheritance tax; Commonwealth *v.* Smith, 5 Barr, 144; In re Alexander, 4 L. J. 448. The cases are recent which settle this act does not make a deed void, but voidable, by execution, which could not have been had under the law of the *situs*, for their statute had been complied with; besides, all the immunities of property, under the laws of our states, attach upon all property within them, and it would be against comity to extend a local statute to affect personalty in another state, the citizens of which must necessarily be ignorant of it.

2. Where there is no original privity to constitute an implied contract, and an act is relied on to give title, an election is involved which must precede the suit. The reason is, until such election is

determined, there is no title or right to be enforced by action. [GIBSON, C. J.—What do you say to the case of a wife's *choses?*] She must join in the action, and her privity of contract supports it. The defendants here being trustees, were like agents, who cannot suspend their agency, or deny their principal's title, until a demand by a stranger. If the title vested by the insolvent proceedings, the defendants were not bound to recognise it until demand made. This is a clear case for such a point, and the authorities are full; Ashenden *v.* Clapham, Freem. 113, pl. 135: if the action be on a penalty or on a promise by a stranger, a demand must be laid and proved; Birks *v.* Trippet, 1 Saund. 33 b. Wherever a demand is necessary to give title, it must be laid and proved; Wilkinson *v.* Godefroy, 9 Ad. & Ell. 536; Simpson *v.* Routh, 2 Barn. & Cress. 682. [ROGERS, J.—Must a demand precede an attachment execution?] No; for that is the legal *method* of enforcing a right vested by the statute. But here it is conceded, that until an election, the defendants were justified in paying under the assignment. A creditor cannot sue for *eloignment* before execution, for until then he has not perfected his title by election. The other ground, that this being an equitable remedy, is under the same objection. A party proceeding on an equitable right must perfect it before suit brought; Snyder *v.* Wolfley, 8 Serg. & Rawle, 332; 16 Serg. & Rawle, 433; 10 Watts, 140: so in the case of a factor; 10 Johns. 285; or an attorney; 5 Cowen, 376; all of which are because, until demand, there has been no default.

3. The effect of the decree in the Common Pleas was to discharge defendants. But the bill filed renders this more clear. As a bill of interpleader proper, it would have been bad, because defendants could not pay the money into court pending the proceedings in the Common Pleas, nor could they set up the rights adverse to those to which they owed allegiance, further than to give such rights an opportunity to take the proper measures to support their claims; 2 Story's Eq. sect. 816—822; 2 Vesey, jun. 107, 109; 6 Whart. 427; 4 Ad. & Ell. (N. S.) 517; 2 Barn. & Ald. 313; 2 Campb. 345; 10 Bing. 246; 2 Barn. & Cress. 546; 7 Bing. 339. This proceeding was therefore strictly conformable to rule; the defendants, trustees under a voidable assignment, gave notice to adverse claimants, that if they meant to look to them, they must come in and litigate. From that time, the defendants there became the actors; Willes' Eq. Pl. 303; 2 V. & B. 407.

But did not the decree protect them? It did not determine the right to the fund, but did it not protect these mere stakeholders

from the claims of entire strangers? It was not had under the application of defendants, but the act of Assembly. The account must have been filed under the act of Assembly, and preceded any step adverse to the assignment. From that time the proceedings went on to final decree by the ordinary practice of the court where no exceptions are filed. The confirmation of the auditor's report is a final decree, the only one known to our practice; and the certificate of the prothonotary is like the short form used in Chancery: 2 Mad. Ch. 466. Were they bound not merely to give notice, but to act contrary to the allegiance they owed to those claiming under the assignment? The undisputed decision in Fassitt v. Phillips, shows they were bound to go on under the assignment until they were arrested. Had this deed been *void*, this court could not have said " it would be useless to suspend the execution of the trust." So far all the decisions under the 13th Eliz. accord. There was then a compulsory payment under a decree by a trustee under a voidable deed. Can it be pretended, that decree would have been made had these claimants interfered? Surely, the court would have stayed its hand until the rights were determined. In what does this differ from a payment to an executor under a forged will? Allen v. Dundas, 3 Term Rep. 125. The rule seems clear that a compulsory payment under a decree, where there is no contract or privity between the real owner and the holder of the fund, will always discharge the defendant, unless there be fraud; whether it be conclusive on the right, is entirely a different question: Mayer v. Foulkrod, 4 Wash. C. C. R. 502. There a legacy was paid under a decree to one admitted to have no title, but the owner was turned round to the recipient of. the fund. So in foreign attachment, 4 Bing. N. C. 782, though notice has not been given. Even in Philips v. Hunter, 2 H. Bl. 408, it was conceded that a debtor paying under decree differed from a creditor receiving contrary to the policy of the bankrupt act: Embree v. Hanna, 5 Johns. 102, nor is the priority of suit a matter at all material: Holmes v. Remsen, 20 Johns. 229—268, S. C. 4 Johns. C. R. 460.. Here, however, the proceeding which resulted in the decree was commenced before any attack made on the assignment, whether this claim was abandoned or extinguished. 4th. Should not the jury have been allowed to pass upon the effect of the acts and omissions of the trustees after suit brought? 1. If they had been strangers in interest; 2. Could their interest affect this point? 3. The non-claim and acquiescence, inducing a belief that the suit had been abandoned. Clearly, any private right would have been barred; and can a trus-

2 X

tee be corporeally present and assent to a payment of money, and then claim as trustee against the person paying? Even at law this is not allowed: Pickard v. Sears, 6 Ad. & El. 474. But in equity, which this suit is said to be, time alone cures such matters: 1 Sch. & Lef. 74. Here, from 1839, when the distribution was made, until 1844, no *narr.* was filed, but on all occasions the right disclaimed as trustees. 1 P. Wms. 357, is in point; there the distribution was made without objection, pending an appeal: 1 Barr, 309; Story's Eq. s. 387. How could defendants, not privies to these rights, look beyond the acts and declarations of the legal representatives of the adverse interests? The Common Pleas could not see an incompatibility of relations, nor any violation of duty. How then could strangers—laymen—be expected to see it? With how much greater force does this apply to the March assignment, where there was no such interest. But the separate action of the trustees was relied on. Their action need not be joint, so that both assent: Sug. Pow. 339; Vandever's Appeal, 8 Watts & Serg. 409. A trustee may by acts bind or affect his *cestuis que trust*; Prevost v. Gratz, Pet. C. C. 373, adopted in 6 Wheat. 507; nor can these defendants, or the creditors, be affected by the personal interest of the trustees; for their appointment was an act of the court, and their bonds are to answer for these matters: Wager v. Miller, 4 Serg. & Rawle, 124; Crowell v. Meconkey, 5 Barr, 168; Furness v. Ewing, 2 Barr, 479. The proceedings of the individual creditors, being hostile to both plaintiff and defendants, are out of the case. But, prior to Stewart v. McMinn, the attachments only bound the surplus. How, then, could they give notice of a fraud in a deed which they, in fact, affirmed? 3 Atk. 243. As to the bills, they fell by the discontinuance of the suits: 4 Johns. C. R. 676.

*Guillou* and *Fallon*, contrà.—The present plaintiff cannot be charged with laches, nor can the defendants set up ignorance of the creditors' claims after all the notices given. To the argument on the invalidity of the June assignment, nothing need be added but that by coming in under that, the property assigned in March must have been given up. That assignment was invalid for not being recorded under the act of 1818, which was intended to compel public notice of these instruments for the benefit of creditors, and has been liberally construed and the evil lessened: Englebert v. Blanjot, 2 Whart. 244. It is a Pennsylvania assignee who sets up the defence, that the act does not apply to him, because the property was abroad. But the evidence shows it was a sale made

of property at sea, and it was the debt that passed under the assignment. That debt, at all events, was within the domicil of the creditor. In Milne v. Morton, a distinction was taken between tangible and intangible property. But, under this deed, we show that both tangible and intangible property passed. As to the expediency of the law, the creditors have no concern with that; but a sufficient answer is found in the fact, that, but for this case, they would never have obtained an account of the property. A duplicate would avoid all the difficulties from delay, and now the mail can always be anticipated. The only question is, could the legislature regulate this matter? and that they can, results from the rule that personal property has no *situs* but the residence of the owner: 1 H. Bl. 690; Story Confl. Laws, s. 379, 381, 388; Black v. Zacharie, 3 How. 514. It is only where there are positive local laws which will be transgressed, that an exception is made: Commonwealth v. Bassford, 6 Hill, 528; or to give a remedy to the local creditors: Plestoro v. Abrahams, 3 Wend. 539; Lowry v. Hall, 2 Watts & Serg. 132; Mulliken v. Aughinbaugh, 1 Penna. Rep. 117; Blake v. Williams, 6 Pick. 314; Miller's Estate, 3 Rawle, 312, 3 Penna. Rep. 187. If this were not so, a mere removal of goods across the river would annihilate the statute. Nor is it the case of a foreign creditor only, for all the other creditors are provided for after his preference.

2. A demand is not required, for this action is but in lieu of the executions of the particular creditors. Like the case of an agent acting beyond his orders, the act may be affirmed and the proceeds sued for: Reed v. James, 1 Stark. 106, 134; King v. Leith, 2 Term Rep. 142; Chit. Pl. 90, and n.

3. The hardship of the case is pressed on this point. But, surely, after the suits almost innumerable, and the notices, it cannot be said there is any. It was plainly the duty of the defendants to set up this claim against the action of the court, if that decree did not bind us. That it did not, is plain. Not only were we not parties—a cardinal principle—12 Wheat. 193, but we were not entitled to interfere. This was *the* point of Okie's Appeal, 9 Watts & Serg. 156. This defence only applies to the June assignment. But why abandon their bill? Was not that a plain recognition of the inefficacy of a decree? As we could not apply to the Common Pleas, so neither could we to chancery—the jurisdiction not existing until the act of 1841: Gilder v. Merwin, 6 Whart. 522. Nor is it true that we have a remedy over against the recipients, unless there was bad faith: Diechman v. Bank, 1 Rawle,

54. The decree in effect was a mere determination of the respective rights of the parties, and the ground of the jurisdiction was that such rights existed.

4. It is said we are barred by the abandonment of this suit and the acts of the trustees. The Common Pleas has decided there was no abandonment, and on that very account, set up by the trustees, refused to dismiss them. As to the acts of the trustees, they would amount to fraud, if thereby any rights were abandoned, or adverse rights confirmed; and no right can be acquired through the medium of the fraud, even of a stranger: Huegenin v. Basley, 14 Ves. 289; 2 Ves., Sr. 627; 1 Watts, 441; 3 Mau. & Sel. 574; 7 Moore, 617; Fonb. Eq. b. 2, c. 7, s. 1, n. a. Nor have there been any acts, as trustees, affirming this assignment. It is true they need not act at the same instant; but it must be *eo intuitu*, 1 Ry. & Mo. 364; 1 Deac. 385; Lew. on Trusts, 265; 16 Serg. & Rawle, 337; 8 Watts & Serg. 405; 19 Ves. 463, and knowingly with intent to produce this effect: 1 Am. Lead. Ca. 418; 23 Maine, 517. Nor could they thus affect their *cestuis que trust:* Seal v. Duffy, 4 Barr, 278; 2 Watts & Serg. 491; 1 Barr, 317.

*Reply.*—The position of the court was that, because the plaintiffs could not be heard, the decree was not binding, and it was supposed Okie's Appeal decided this. But the distinction is there taken between the auditors, who are appointed for a special purpose, and the court. Was it meant to say there, that if the trustees and their sureties were insolvent, Okie could not reach the fund without consent? *Certainly not; but that he must apply* to the court. This proceeding, by petition, is common to all courts proceeding according to the course of the civil law, including courts of chancery; 2 Paige, 26; 9 Ves. 335; Gilb. For. Rom.; and very clearly appears from Rossiter's Appeal in 2 Barr, 371: though the bailee cannot have a bill, yet the *tertius interveniens* may always come in: Story's Eq. s. 824. That court proceeds according to the course of chancery, and has all the incidental powers necessary to protect parties. This practice appears in Mallow v. Hinde, 12 Wheat. 194, and Miller v. Moss, C. C. U. S. Ap. T. 1843, No. 1, where the court stayed proceedings until this cause is decided.

*May* 15. COULTER, J.—The cause presents two distinct departments or allotment of facts, which were necessarily considered by the learned judge who presided in the Court of Nisi Prius sepa-

rately; and they will be so considered here. The first arises under the assignment, dated the 22d March, 1837. The deed was not recorded within thirty days, in the county of Philadelphia, where the grantors resided, and the court below instructed the jury that it was therefore null and void under the 5th section of the act of 24th March, 1818; and that the circumstance that the property which it embraced was all in the state of New York, did not obviate the necessity of recording it in Philadelphia county, inasmuch as the law of the domicil must govern and prevail. A majority of this court is of opinion that the deed was voidable, and that, up to the time when the trustees in insolvency were appointed, and gave security, any of the creditors of the assignors might have elected to consider the deed, and could have lawfully arrested the property or funds in the hands of the assignees, for the payment of their claims respectively, by proper legal means, or by distinct and definite notice to the assignees that they intended, by legal measures, to contest the validity of the deed; which, if duly followed up by legal process, would have withdrawn so much of the funds or property from the hands of the assignees. But that after the appointment of the trustees and their giving bond, they alone were competent to arrest the assignees in the execution of the trust, by legal measures or by notice, duly followed up by legal process. We view the case, therefore, in conformity with that opinion. The court below further instructed the jury on this branch of the case, "that the first assignment, to wit, the assignment of 22d March, 1837, was void, and that, consequently, the plaintiff had a right to recover all the money in the hands of the defendants under it, at least at the time the suit was commenced; to wit, the 29th September, 1838, with interest from that date, amounting to $11,839$\frac{35}{100}$." A majority of this court believe there was error in this instruction. The assignment was not void between the assignors and assignees, and the creditors who chose to consider it valid. And all acts done, or payments made, by the assignees, under it, without notice of adversary claims, and while it was, apparently at least, unimpeached and fair, must be considered good, for then no presumption or proof would exist, that their conduct was not *bona fide* and innocent, and their intention honest, and without design to give illegal preferences. In Seal *v.* Duffy, 4 Barr, 274, it was ruled by this court that an assignment for benefit of creditors, not recorded within thirty days, was valid against a subsequent voluntary assignee, and that creditors could avoid the deed by levying on the property, *pro tanto* only. The opinion by Mr.

Justice Bell runs to this effect: that the unrecorded deed remained valid for the purpose of passing the property, as to all the world, until attached by execution issued and levied; and that this interfered only so far as to withdraw what was taken in execution, from the operation of the deed. This goes beyond the exigencies of the present case, and establishes, undoubtedly, that whilst the assignees proceeded innocently in the execution of their trust, to wit, the first assignment, they will be protected by the law. And In re Wilson's Accounts, 4 Barr, 431, it was resolved by this court, that for payments made to his *cestuis que trust* before an adverse claim by the insolvent trustee and assignee in bankruptcy, the voluntary assignee was protected. The liability of the defendants below does not therefore depend upon the mere circumstance of the non-recording of the deed, nor on the commencement of this suit, unless it gave adequate notice of an adversary claim.

In Seal *v.* Duffy it is asserted that the only efficacious mode of arresting assignees is by execution and levy on the part of the creditor. And in Hennessy *v.* The Western Bank, 6 Watts & Serg. 311, an attachment in execution, which is in fact the same thing, is considered adequate. But in both these cases there is a clear, distinct, and unequivocal notice to the assignee that the legality of his trust is questioned by lawful measures; and that these measures, if effectual, will protect him from his *cestuis que trust.* And in all fairness the assignee is entitled to distinct and unequivocal notice.

On the one hand, he has accepted a trust which he is bound in honesty and by law to fulfil, unless he is arrested in its discharge by adequate legal measures on the part of those who would interpose and stop him. On the other, shall he be presented with impalpable shadows, vague and indefinite surmises, or mere conjectures, to swerve him from the path of duty which is plain and obvious? Did, then, the commencement of this suit in September, 1838, by the trustees, in which no declaration was filed until May, 1844, give the defendants or assignees any notice whatever that the deed under which they were acting—that is, the first assignment—was void as against the creditors, and that they intended to contest its validity in that suit? On this subject the learned judge, in another part of his charge, says " that the trustees who brought this suit *qua* trustees, have literally done nothing except to institute the suit we are now trying; they never received a cent of money as trustees, *nor did they ask for any.* This they carefully avoided. They never took a single step in this suit, not even so

far as to file a declaration *showing their cause of action.*" And yet these same trustees in insolvency were the only persons who could lawfully give notice, make a demand, or institute adversary proceedings and show their cause of action, so as to put the assignees in the wrong. If the trustees had given notice, by any lawful means, to the assignees, there would exist some reason for charging them with electing to take upon themselves all the responsibility of the validity of the assignment, and perhaps sufficient grounds to subject them to the imputation of designing to favour the *cestuis que trust* to the injury of the other creditors. But it must be considered that the institution of the suit gave them no information whatever as to the nature of the demand. No declaration was filed; and the suit was suffered to sleep on the record for nearly six years, enlivened by no action on the part of those who instituted it. The law favours vigilant creditors, and not those who slumber on their rights, so that others may be innocently entrapped. From the very admitted fact that the assignees were protected in payments made before the commencement of the suit, it would seem to follow irresistibly that they were protected for payments made afterwards, unless the commencement of the suit gave notice of the cause of action. The only means by which that is done, is by filing the declaration, which was not done until 1844. There was nothing in the commencement of the suit, of itself, by which the assignees could be informed that it was for the recovery of the money received by them under the first assignment. The case may furnish reasons why the assignees, if they speculated on the subject, would have been strongly impelled to the conclusion that the suit was not for the purpose now assigned to it, but a different one. But as this case will be again tried, I pause not to enumerate them. The trustees in insolvency were the actors, by whom the assignees could be arrested, or brought to a stop. The mode of doing so was plain and easy. The responsibility was on them; and if they acted erroneously or faithlessly, as alleged, and, either by omission or supineness, permitted the assignees to disburse the money innocently, the loss ought not to fall on those who were guilty of no *laches.* Any evidence, in addition to the commencement of the suit, and the non-recording of the deed, that the trustees in insolvency had given the assignees direct and distinct notice that they intended to make a claim adverse to the *cestuis que trust,* for the money in their hands, and that they intended to prosecute that claim by legal means, would be entitled to be considered by the jury; and all facts and circumstances tending to

show that the assignees, after full notice, by legal means, from the trustees, of an adversary claim, persisted in payments to their *cestuis que trust*, ought to be submitted to the jury for their determination, and as conducing to establish that they intended to give an illegal preference to their *cestuis que trust*, to the injury and in fraud of the other creditors. In a subsequent part of the charge of the court below, the eminent judge who sat at Nisi Prius seems in a modified manner to submit the question of notice to the determination of the jury, but in a manner so clogged and restrained in our opinion, as not to leave free scope to their minds on the subject. Thus the court say, "*had they called on the trustees in a proper way for a bill of particulars, would they have been informed that the suit was intended to recover all the money, of whatever kind or description, that was in their hands belonging to the estate of Moss and Phillips, as well under the first as under the second assignment? For if they would, then there is nothing in this part of the defence.*"

The learned judge throws the whole weight of the availability of such defence upon the assignees calling in a proper manner for a bill of particulars, and the probability of the trustees, being properly called on, furnishing such bill. The mere conjectural willingness of the trustees ought surely not to defeat a substantial defence. But the learned judge, in another part of his charge, said that the trustees would do nothing; not even show their cause of action. But I apprehend that the true answer is, that the trustees were the actors; it was their duty to give notice, and to follow up that by due and legal means; and the question is, have they done it, so as to put the assignees in the wrong, and compel them to pay the money a second time?

With regard to the other department or branch of the case, a majority of this court are of opinion that the court below fell into error. The assignment of 22d June, 1837, under the operation of the cases of Hennessy *v.* The Western Bank, 6 Watts & Serg. 300, and In re Wilson's Accounts, 4 Barr, 430, must be considered as invalid. But a court of competent jurisdiction, that is the Court of Common Pleas, having jurisdiction over the fund and jurisdiction over the assignees, after a hearing, having made a decree concerning the distribution of the funds in the hands of the assignees, arising under this assignment, and which are claimed in this suit; and the assignees having conformed to that decree, and paid the money accordingly, they are protected, and cannot be made to pay the money a second time in this or any other suit. It appears to-

tally insufficient to allege, for the purpose of annulling the decree of the Court of Common Pleas, and making it of no effect, that the plaintiffs in this suit were not parties to the proceeding in the Common Pleas. If not, it was their own fault; they might have become parties, and the Court of Common Pleas, upon proper application, would have been bound to hear them. By the thirty-third section of the act of 14th June, 1836, " the several courts of Common Pleas shall have the same powers and authority, and the manner of proceeding to obtain the appearance of persons amenable to their jurisdiction, in cases of trusts, and to compel obedience to their orders and decrees, and enforce execution thereof, shall be the same as are now by law vested in the several Orphans' Courts." And the thirty-sixth section provides that *any person aggrieved* by a definitive judgment or decree relating to trustees or assignees, may appeal to the Supreme Court. Now it cannot be doubted but that a person who had a large claim against an individual who voluntarily assigned all his property for the benefit of certain other creditors, which assignment he could establish to be invalid, would be a person aggrieved, by a definitive decree that it was good, and transferring the funds to the persons named, as *cestuis que trust.* He would have an interest in the fund which the court distributed by the decree, and every rule of justice would demand that he should be heard; and could any court, untrammelled by the forms of actions at common law between individuals, deny him a hearing? This proceeding is analogous to proceedings in chancery where forms are flexible: they mould their decrees so as to cover the exigencies of the case, and adapt the remedy so as to suit mutual and adverse claims; they bring before them all persons interested in the subject-matter. Why cannot, and why should not courts of Common Pleas, when proceeding in a course of justice, not by the technical rules of the common law, do the same thing? It would be a sorry spectacle for a lover of jurisprudence to witness a court making a decree for the distribution of the fund over which it had jurisdiction, which decree it had power to enforce by sequestration of the goods and attachment of the person of the trustee, when an individual asked to be heard, and was turned over to another jurisdiction, where he might treat the decree as a nullity, because he was not a party, and compel the trustee to pay the money over again. The case of Okie's Appeal, 9 Watts & Serg., is relied on to sustain the position that the Court of Common Pleas could not admit any person, without the deed, as a party. But that case only ruled that auditors could not do it, because their duties,

being inferior, allowed them only the power to audit and settle the account referred to them by the Court of Common Pleas. This court perceive nothing in that case which stands in their way. It was not decided till 1844, and therefore could not have even misled the trustees. That case resulted finally in decreeing the money in the hands of the assignee to a person without the deed. And if the Common Pleas or this court can decree it to a person without the deed or trust, it is because he is entitled to it; and if he is entitled, why not allow him to ask for it, as well as decree it to him on the petition of the trustee?

But the proceedings in the Common Pleas ought to be regarded as a proceeding *in rem*, which binds all the world. It is the fund or property concerning which the court decree, and notice is directed by the statute to be given, not to the *cestuis que trust* named in the deed, but to everybody, by means of publications in newspapers; on which notice, it shall be recited that the court at a particular day will make a decree, or allow the account of the assignee, unless cause be shown why it should not be allowed. Can it be possible that a decree of a court, made after such general notice, shall not protect the assignee, who yields obedience to it, and who can be compelled to do so by sequestration of his estate and attachment of his person? The fourth article of the second paragraph of the thirteenth section [the thirteenth section and the fourteenth section, in the original draft of the law, were thrown into one] of the law of 16th June, 1836, defining the power and jurisdiction of the courts, is in these words: The courts of Common Pleas shall have " the determination of rights to property or money, claimed by two or more persons, in the hands or possession of a person claiming no right of property therein;" and the revisers of our code, in presenting the act " Relating to assignees for the benefit of creditors and other trustees," accompany it with the following observation, with others, to wit: " The design of the bill is to declare in what manner the jurisdiction given to the several courts of Common Pleas over trustees, by the fourth article of the fourteenth section [second clause, thirteenth section] of the bill relating to the jurisdiction and powers of courts, shall be exercised in the principal cases arising. It is not intended to include all the cases which may arise. In respect to those which are not mentioned in this bill, the courts will proceed in conformity with the practice in equity, prescribed or adopted by the Supreme Court of the United States." This seems to meet the case, and to establish that in all cases in which two or more persons claim money in the

hands of an assignee or trustee, no matter by what right or title, the court have jurisdiction under this act relating to assignees; and if the mode of proceeding in any particular case is not pointed out in the act, the proceeding must be according to the rules and forms of equity. The revision of the code intended to make a system, and in order to give that system symmetry and usefulness, vested the jurisdiction over the fund, over the trustee, and over all persons claiming it in the same court and in the same proceeding. In support of this view of the case, to wit, that the judgment or decree of a court of competent jurisdiction protects those who are within its grasp or process, and yield it obedience, and cannot be overhauled in a collateral suit, I refer to Mayer v. Foulkrod, 4 Wash. C. C. Rep. 504; Philips v. Hunter, 2 H. Bl. 402. A majority of the court are of opinion that the court below erred in instructing the jury that the plaintiffs were entitled to recover the money in the hands of the assignees, under the assignment of 22d June, 1837, which they had paid to others, in pursuance of a decree of the Court of Common Pleas of Philadelphia county, in settling their account. It was impossible to perfect the system on the first draft of the law: firmness in the courts will fill up omissions. We are of opinion that they cannot be compelled by law to pay it a second time, and to other persons. This opinion meets the errors assigned, or renders consideration of them in detail unnecessary.

The judgment is reversed, and a *venire de novo* awarded.

GIBSON, C. J., dissented on all the points ruled against the general creditors, and concurred entirely with the charge of Mr. Justice Rogers, who also dissented from this opinion.